UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN JOSEPH WATERS, JR.,<br><br>Defendant. | NO. 13-CR-203 (ADM/JJG)<br><br><br>**GOVERNMENT'S TRIAL BRIEF** |

The United States of America, by and through its undersigned counsel, hereby respectfully submits this trial brief.

## FACTUAL BACKGROUND

**Introduction**

*I had a written employment contract that*

*was negotiated and signed in 1996 that was*

*"**never subsequently changed, modified, or updated**."*

John Joseph Waters, Jr.
Sworn testimony in AGM&M litigation
April 21, 2009 (emphasis added)

\* \* \*

This is a case that involves betrayal, lies, stealing, tax-cheating, blackmail, and finally a fraud on the Court. In this case, the government will present overwhelming evidence that will prove beyond a reasonable doubt that John Waters devised and executed a fraudulent scheme to embezzle millions of dollars from his employer, the philanthropist

and retired West Publishing executive Gerard Cafesjian.   Waters used the stolen money to satisfy the expensive personal spending habits of himself, his family, and a mistress whom he was secretly supporting for years.

When confronted with his crimes by his victim, he resorted to blackmail.   When that did not work, he committed a fraud on this Court by filing a baseless civil lawsuit, since dismissed by Judge Kyle, that was calculated to do nothing more than deflect, embarrass, and cause additional pain to his victim in what would be the final years of his life.   In his lawsuit, launched three years after he resigned, the defendant alleged for the first time – and inconsistent with his sworn testimony quoted above and numerous other admissions and pieces of evidence that the government will offer at trial – that Cafesjian had agreed to permit the defendant to take millions from him "as needed" pursuant to a "Modified Employment Agreement."

## The Embezzlement Scheme

The defendant began working for Cafesjian's family office upon Cafesjian's retirement from West Publishing in 1996.   He quickly earned Cafesjian's trust, gained authority and control over virtually every aspect of his affairs, including his bank and investment accounts, and engaged in daily acts of deception to facilitate his scheme and keep it from being discovered.   He exercised strict control over Cafesjian's office mail, especially when it came to the statements for the US Bank accounts he was using to facilitate the embezzlement.   He cashed checks totaling more than $2.3 million, yet only once did the defendant withdraw more than $10,000 at one time, knowing that to take more might cause the bank to alert law enforcement.   And the defendant gave more than

2

$700,000 of the stolen funds to his mistress, Cheri Kuhn (now Cheri Waters), whom he met at the Déjà Vu nightclub in the late 1990s and with whom he was having a long-term affair.

To conceal his fraud, in addition to the currency structuring, the defendant layered the stolen money through a series of bank accounts that he controlled, including an account that he opened in 2002 in the name of Ani Yeranosyan, an Armenian student who lived with the Waters family for a short time.   Yeranosyan graduated from the University of St. Thomas in 2004 and returned to Armenia shortly thereafter, where tragically she was killed in an accident in February 2007.   Yet, even after learning of her death, the defendant continued to use the account he controlled in Yeranosyan's name at US Bank to transfer and layer embezzled funds, going so far as to write her name on deposit tickets for two more years after her death to make it appear as if the funds were deposited for her benefit.

But the funds were of no use to the now-deceased Yeranosyan.   Rather, the defendant used the stolen funds for personal purposes:   not just his own purposes, but also for the benefit of his daughters, his then-wife, and his mistress.   From 1999 and continuing until March 2009, the defendant siphoned more than $4 million out of Cafesjian's personal checking account at Northern Trust Bank in Naples, Florida.   He moved the funds on a generally bimonthly basis into accounts he opened at US Bank.   The US Bank accounts were nominally in Cafesjian's name, yet Waters exclusively controlled both the account activity and the information relating to the accounts.   He wrote hundreds of checks to cash or to the other facilitating accounts, all less than $10,000, and endorsed them himself.

Cafesjian's accountants never saw this activity.   The defendant told them that the accounts were "private" and "secret" and that they "didn't need to know" about what was

going on in them.   The defendant made certain that the account statements were seen by no one in the office but him.   On the couple of occasions when his directive was not followed, the defendant swiftly corrected the office workers who accidentally distributed them.   The defendant periodically directed the accountants to book false entries into the Cafesjian accounting records, to make it appear as if the stolen funds represented the "household purchases" of Cafesjian.   A spreadsheet that the defendant kept on his computer shows that he was tracking every dollar, into and out of those accounts, but only giving the bookkeepers the summary false entries.   He did not give them the detail of the structuring activity that he knew would have revealed his crime.

## The Scheme Is Uncovered

The defendant resigned his position as Cafesjian's assistant in late March 2009. Not long after the defendant resigned, Cafesjian's in-house accountant, Gary Jones, discovered the facilitating US Bank account and quickly saw the defendant's pattern of large deposits followed by smaller checks, under $10,000, all in even amounts, and all signed by the defendant.   Jones remembered that the defendant had told him the account was secret.   But even after the defendant had left his employment, Jones could not find any of the bank records relating to the account in Cafesjian's offices.   So Jones ordered the records from US Bank.   They showed that the same pattern of suspicious activity had been going on for years.

Sometime in the summer of 2009, after learning what the defendant had been doing, Cafesjian directed Jones to ask the defendant what the money he had taken was for. Following his boss's instructions, Jones went to where the defendant was working and

asked him.   The defendant told Jones:   the money was used to buy art, make political contributions, and "other stuff you don't want to know about."

## Cafesjian Hires Former Prosecutor And Retired FBI Agent To Investigate

In February 2011, Cafesjian retained former federal prosecutor Andrew Luger to conduct an investigation of the defendant's embezzlement.   Luger retained Rick Ostrom, a principal of Waypoint Investigations and a retired FBI agent, to lead the investigation. Ostrom and his team identified the following:

- The defendant regularly wrote checks from Cafesjian's Northern Trust account in amounts between $20,000 and $50,000 and deposited those checks into US Bank account ending in *7856.  This was the "private" account for which Jones could not find the records anywhere in the office.

- The total amount that the defendant deposited into the *7856 account from Cafesjian's Northern Trust account, between July 2004 and March 2009, was nearly $3 million.

- After depositing Cafesjian's funds into the *7856 account, the defendant wrote checks payable to cash, withdrew cash at the teller, wrote checks payable to US Bank, or conducted internet transfers, in amounts of $10,000 or less.

- The defendant signed all checks written on the *7856 account, and endorsed all those checks that were made out to "Cash."

- A substantial portion of the proceeds went into other US Bank accounts controlled by the defendant and Cheri Kuhn.

- A second, earlier US Bank account, the *6934 account, contained a similar pattern of deposits from Cafesjian's Northern Trust account, with subsequent withdrawals by the defendant via, primarily, checks that he wrote to cash. The defendant wrote nearly $1.4 million in checks to cash on this account.

In July 2011, investigator Ostrom attempted to interview the defendant about his fraud.   Ostrom first tried to encounter the defendant in person.   But he could not find a time when the defendant was apart from Kuhn.   So, Ostrom called the defendant on the

telephone.  He introduced himself as an investigator for Cafesjian, and asked if the defendant would be willing to meet with him to discuss a financial review he had conducted.

That is when the defendant began playing what he believed was his trump card. The defendant told Ostrom:  Cafesjian did not want to be asking questions.  The defendant stated that if Cafesjian forced his hand, the defendant would reveal information that would impact ongoing litigation as well as Cafesjian's family.  The defendant stated that he would answer questions only if other "trusted people" would be in the room along with Cafesjian.  In particular, the defendant named two of Cafesjian's close friends who served on the board of Cafesjian's family foundation:  (1) Father Dennis Dease, who was the President of the University of St. Thomas; and (2) Dennis Doyle, the founder of Welsh Companies, a real estate firm.  However, the defendant told Ostrom that Cafesjian would not want these "trusted people" to know what he would say.

Undeterred, Cafesjian directed Ostrom to continue attempting to get the defendant to speak with him.  Ostrom spoke with him again on August 12, 2011.  Once again, the defendant told Ostrom that he would consider talking if "trusted people," perhaps members of Cafesjian's foundation board, would sit in on the meeting.  The defendant stated that Cafesjian needed to "think long and hard" about the defendant being interviewed.  The defendant stated that, if Cafesjian thought he could take action against him, without anything coming back to Cafesjian, he did not realize what he was getting into.

Ostrom tried one more time to speak with the defendant, on August 16, 2011.  In that conversation, the defendant opined that Cafesjian was angry, destructive, suffering

6

from "some type of mental capacity impairment," and had "dementia."   He suggested that any interview should be done in a "mutually-agreed" setting where it would be uncomfortable for both the defendant and Cafesjian.   Yet even after all his statements, the defendant volunteered to Ostrom that, although he "could have threatened" Cafesjian, he had not done so because he was "not an extortionist or a blackmailer."

## Cafesjian Refers Matter To Federal Law Enforcement

Later in August 2011, Cafesjian directed his attorneys and investigators to refer the matter to law enforcement.   In December 2011, FBI Special Agent Travis Yarbrough contacted the defendant by telephone.   The defendant told Special Agent Yarbrough that he had been Cafesjian's right-hand person for a dozen years.   The defendant stated that Cafesjian was narcissistic, suffered from dementia, and had memory loss.   The defendant also told Special Agent Yarbrough that Cafesjian had secrets, and that Cafesjian had the defendant move cash for him in different accounts.   The defendant stated he was "not proud" of this and felt that he would have to "divulge details" if he agreed to speak with the FBI.   The defendant also restated the proposal he made to Ostrom to be interviewed on the condition that "two other trusted individuals," known to both Waters and Cafesjian, would be present.   Special Agent Yarbrough informed the defendant that those conditions were not necessary.

## Waters Files Civil Suit Against Cafesjian, His Company, And His Foundation

On March 13, 2012, the defendant, representing himself, filed a civil lawsuit against Cafesjian in this Court.   *See Waters v. Cafesjian, et al.*, No. 12-CV-648 (RHK/LIB).   The lawsuit made a demand for payment of $5,000,000.   In a lengthy complaint, the defendant

alleged, among other things, that Cafesjian had orally agreed to modify his employment agreement.   This purported "Modified Employment Agreement" became effective in 2000, and entitled the defendant to a percentage of all of Cafesjian's holdings as additional "base" and "incentive" compensation over and above his salary.   A portion would be "current" and a portion would be "deferred."

The defendant further alleged that in 2005 Cafesjian agreed to "loan" funds to the defendant, through periodic, "as-needed advances" against the amount that Cafesjian owed to him as "deferred" compensation under the "Modified Employment Agreement." According to the defendant, he took "advances" from Cafesjian, from 2005 through 2009, totaling $1.8 million.   However, the amount the defendant took in "loans" against his "deferred compensation" was far less than the amount that Cafesjian owed him as a percentage of his holdings.   Thus, according to the defendant, not only had he not stolen from Cafesjian, but in fact, Cafesjian owed him millions more under their "Modified Employment Agreement."[1]

Cafesjian counterclaimed, alleging embezzlement, fraud, and conversion.   In discovery, the defendant was deposed and gave sworn testimony.   The government intends to offer portions of that testimony against him as sworn admissions under Rule 801. Among them:

---

[1] The defendant made other, less significant – but equally and demonstrably false – allegations in his lawsuit against Cafesjian, including:  (1) that he was owed nearly $500,000 in vacation, holiday, and sick pay; (2) that he was owed a "special bonus" for his participation in a civil lawsuit over the Armenian Genocide Memorial & Museum ("AGM&M") project; (3) that he was owed another "special bonus" for his work on the sale of a Cafesjian-owned entity; and (4) that he was entitled to indemnification under an agreement with Cafesjian related to the AGM&M litigation.

- The "Modified Employment Agreement" was never reduced to writing.

- The defendant did not disclose his supposed additional compensation to his then-wife.

- The defendant did not disclose any of the millions in "loans" to his wife because it was "not important at the time."

- None of his "loans" from Cafesjian were recorded on the general ledgers of the company.

- The defendant did not disclose the deferred compensation on his financial statements to apply for numerous real estate or car loans.

- The defendant did not disclose either the deferred compensation expectation, or his loans against it, on a detailed financial statement and application that he signed and submitted in 2008 to serve on the board of Tradition Capital Bank.

- The defendant felt he was worth more than he was paid.

- The defendant collected and took the records for the *7856 account with him, out of Cafesjian's office and to his house, when he resigned.

- The defendant prepared and filed his own tax returns.

- The defendant was responsible for all of the Cafesjian account wire transfers.

- Even though his supposed "Modified Employment Agreement" required an annual calculation of the value of Cafesjian's holdings, he did not have

a single document that reflected those calculations for purposes of the agreement, nor any document that reflected his annual outstanding "loan" balance for his "periodic, as-needed advances."

- After his resignation, the defendant returned to Cafesjian's family office, in the early morning hours of March 30, 2009, to take home the documents relating to the two US Bank "private" accounts.

- The defendant knew that by making withdrawals of less than $10,000 each he could potentially avoid the triggering of US Bank's obligation to report his activity to law enforcement.

The defendant had the ability to take discovery in the civil case, including from a number of people who supposedly knew about his oral "Modified Employment Agreement."   The only people he chose to depose, however, were:   (1) David Starkweather, Cafesjian's longtime loyal assistant in Florida, whom he questioned very little about cash or compensation, but extensively about private details from Cafesjian's personal life; and (2) Cafesjian's wife of 66 years, Cleo Cafesjian, who at the time of her deposition on February 21, 2013 was gravely ill and who, accompanied by her husband, his attorney, and her treating physician, was compelled to answer questions about not only cash and gifts but also the financial condition of her children, her granddaughter, and whether her husband went out of his way to befriend private jet owners in order to "get access to free rides."[2]

---

[2] Mrs. Cafesjian passed away exactly two weeks later, on March 7, 2013.

Judge Kyle granted Cafesjian's and his related entities' motion for summary judgment, and ordered that all of the defendant's claims be dismissed.   Cafesjian's counterclaims against the defendant remain pending.   However, after the defendant was indicted in August 2013, the parties to the civil case agreed to stay those proceedings pending this criminal case.

**Tax Charges**

In addition to his embezzlement scheme, the defendant is charged with multiple counts of income tax evasion and filing false income tax returns.   The defendant never reported his embezzled income on his income tax returns.   In addition, the defendant failed to file annual gift tax returns to report the hundreds of thousands of dollars in gifts he made to Cheri Kuhn and his daughters.   Finally, the defendant falsely reported rental income on a Minnetonka townhome, which he and his then-wife purchased in 2003 as a purported rental property, but which he actually used to provide rent-free housing to Kuhn.

Even if the defendant is successful in defending against the embezzlement charges on the theory that the embezzled income was earned or borrowed, rather than stolen, that defense will be of no aid to the defendant on the tax charges.   Whether stolen, earned, or a loan he has never paid back, the money he received is reportable income that he willfully failed to report.

## ARGUMENT

The government expects to prove its case by calling approximately 20 witnesses. The witnesses include former Cafesjian employees, friends, and associates, as well as bank and law enforcement witnesses.   In addition, if the government is unable to enter into

11

stipulations with the defendant concerning the foundation of records, the government may need to call several records custodian witnesses.

The government will offer a number of exhibits, including Cafesjian office records, bank records, documents produced by the defendant or found on his computers, summary charts, emails, tax returns, and other documents.   The government will offer a series of sworn admissions that the defendant made, both in his own deposition in the *Waters v. Cafesjian* case, as well as in depositions and bench trial testimony he gave in the AGM&M litigation.

The government anticipates that, depending upon the length of cross-examinations and the need to authenticate business and public records, it should be able to rest its case by the end of the first week or the early part of the second week.

**I.     The Court Should Permit The Government To Offer Evidence Of Certain Of Gerard Cafesjian's Words And Actions Because They Are Relevant, Non-Testimonial, And Either Non-Hearsay Or Excepted Hearsay.**

As the Court is aware, prior to his death, Cafesjian gave deposition testimony in the *Waters v. Cafesjian, et al.* civil suit.   The Court has ruled that testimony to be inadmissible.   However, Cafesjian also made certain non-testimonial statements to various witnesses that are admissible either as non-hearsay or as exceptions to the hearsay rule.   The government will seek to offer these statements at the defendant's trial.

As an initial matter, because all of the words and statements described below are either non-hearsay or non-testimonial, they do not implicate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 59 n.9, 68 (2004).   Evidence that is not hearsay under Rule 801 (i.e., not an assertion or not offered for its truth) is admissible without

confrontation.   *Crawford,* 541 U.S. at 51, 59-60 n. 9; *United States v. York*, 572 F.3d 415 (7th Cir. 2009) ("*Crawford* applies only to hearsay, which must be a statement offered for the truth of the matter asserted").

Similarly, statements that are non-testimonial do not invoke the right of confrontation.   Testimonial statements are those such as "ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *United States v. Dale*, 614 F.3d 942, 955-56 (8th Cir. 2010) (quoting *Crawford,* 541 U.S. at 51–52)).   All of the statements in Part B below were made in contexts wholly apart from bearing witness in a criminal prosecution.   Instead, they were made to an employee and a close friend, away from any judicial or law enforcement proceeding.   They are thus admissible pursuant to Rule 803(3) without regard to confrontation issues.   *See Crawford*, 541 U.S. at 68.

### A.    *Cafesjian Statements Admissible As Non-Hearsay*

The government intends to offer several statements that Cafesjian made to witnesses that are not hearsay.   That is, they are not "statements" as defined by Rule 801 of the Federal Rules of Evidence.   A "statement" for purposes of the rule against hearsay is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."   FED. R. EVID. 801(a).   "Hearsay," in turn, is defined as "a statement" made out of court and offered "to prove the truth of the matter asserted in the statement."

FED. R. EVID. 801(c).   Accordingly, if words or actions are not intended as assertions, they are not statements and therefore not hearsay.

Questions and commands are just such evidence. "Questions and commands generally are not intended as assertions and therefore cannot constitute hearsay."   *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006) (citations omitted).   Thus, a directive or question by an out-of-court declarant falls outside the hearsay proscription and is admissible against a defendant in a criminal trial.   *Id.*; *see also United States v. Rodriguez-Lopez*, 565 F.3d 312, 314-15 (6th Cir. 2009) ("[Q]uestions or commands . . . could not—absent some indication that the statements were actually code for something else—be offered for their truth because they would not be assertive speech at all.   They would not assert a proposition that could be true or false[.]"); *United States v. White*, 639 F.3d 331, 337-38 (7th Cir. 2011) (observing that "a command is not hearsay because it is not an assertion of fact"); *Lexington Ins. Co. v. Western Penn. Hosp.*, 423 F.3d 318, 330-31 (3d Cir. 2005) (holding that "questions and inquiries are generally *not* hearsay because the declarant does not have the requisite assertive intent, even if the question 'convey[s] an implicit message' or provides information about the declarant's assumptions or beliefs") (emphasis in original).

In this case, Cafesjian asked questions of people, and instructed people to take certain actions regarding the defendant's embezzlement.   For example, after he learned of the *7856 account from Gary Jones, Cafesjian told Jones to investigate the account, saying effectively, "go and find out what this is about."   Later, after Jones obtained the bank

14

records from US Bank and saw all the suspicious activity, Cafesjian directed Jones to "ask John where the money went."

Jones will also testify as to questions he received from Mr. Cafesjian, who regularly inquired about the status of his investigation of the *7856 account. Jones observed that the investigation was weighing heavily on Cafesjian's mind, to the extent that approximately 75 percent of the questions Cafesjian asked of Jones in their business dealings related to what Jones was learning about the *7856 account.

In addition to the instructions to Jones, Cafesjian issued several other directives related to the investigation of embezzlement. Cafesjian instructed investigator Ostrom to investigate the fraud fully and without restriction. He told Ostrom to proceed with an attempt to interview the defendant. When Ostrom reported the defendant had responded with threats, Cafesjian was undeterred and directed Ostrom to continue the investigation. Additionally, it was Cafesjian who eventually instructed Luger and Ostrom to refer the matter to the FBI and U.S. Attorney's Office.

All of the above statements of Cafesjian, and others like them that may arise in trial, are not assertions and therefore not hearsay. Because all of these questions and directives are not assertive "statements" under the Federal Rules of Evidence, they are not hearsay and are admissible against the defendant.

Furthermore, pursuant to the definition of hearsay set forth in Rule 801(c), statements that are not offered for the truth of the matter asserted are also not hearsay. FED. R. EVID. 801(c). The government intends to offer at least one such statement Cafesjian made prior to revelation of the fraud. Long before the defendant's betrayal was

15

uncovered and while he still worked for Cafesjian, Cafesjian's daughter, Kathie Baradaran, raised concerns with her father regarding his decision to place a Florida condominium in the defendant's name.   Cafesjian responded to Ms. Baradaran's concern by telling her, "John can be trusted."   The government will not be offering this statement to prove the fact asserted, i.e., that the defendant was trustworthy.   To the contrary, the government intends to prove that the defendant could not be trusted.   However, the statement is admissible non-hearsay because it shows Cafesjian's state of mind, i.e., that Cafesjian *believed* Waters was trustworthy.

      B.     *Cafesjian Statements Admissible Under Rule 803(3)*

Rule 803(3) of the Federal Rules of Evidence excepts from the rule against hearsay a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." FED. R. EVID. 803(3).

Upon discovering the existence of the *7856 account and subsequently learning that the defendant had been stealing money from him through this account, Cafejian made a series of statements of his then-existing state of mind that are admissible under Rule 803(3).   These statements can generally be classified as either:   (1) statements of Cafesjian's then-existing state of mind as to the topic being contemporaneously discussed, or (2) statements of Cafesjian's then-existing intention.

For instance, after his discovery of the *7856 account statement, Gary Jones went to Cafesjian and asked him about the account.   According to Jones, Cafesjian sounded surprised and immediately responded that he did not know anything about that account. This statement reflects Cafesjian's state of mind at the precise moment he learned of the *7856 account.

Similarly, Cafesjian made statements to his longtime friend, Father Dennis Dease, regarding the embezzlement that were "contemporaneous with [Cafesjian's] then-existing state of mind" and thus should be admissible.   *United States v. Barraza*, 576 F.3d 798, 805 (8th Cir. 2009).   When the two spoke about the defendant, Cafesjian told Dease that he "was going to investigate whether Waters had stolen money from him."   Later, when the investigation had uncovered the facts of Waters's duplicity, Cafesjian told Dease he was thinking of filing a civil suit but felt he did not have time because of his old age and health. Cafesjian told Dease that he was instead referring the case to the FBI and "hoped justice would be done."

The Cafesjian statements of then-existing state-of-mind, contemporaneously discussed with the witness – the statement to Jones that "I do not know anything about that account" and the statements to Father Dease that "I hope justice will be done" and that Cafesjian felt too old to pursue a civil suit – reveal Cafesjian's mental state at the exact moment he was making the statements.   The statements do not express a memory or a belief to prove the fact remembered or believed.   They simply recite Cafesjian's state of mind as it then existed.   As such, they are admissible under Rule 803(3).   *See Barraza*,

576 F.3d at 805 (admitting statements "contemporaneous with Eloiza's then-existing state of mind"); *accord United States v. Hyles*, 521 F.3d 946, 959 (8th Cir. 2008).

Likewise, Cafesjian's statements of intention and plan – planning to investigate the embezzlement, intending to refer the case to the FBI – reflect Cafesjian's intentions and plans at the moment he made the statements, and fall squarely within Rule 803(3).   FED. R. EVID. 803(3) (excepting statements of mental state "such as intent, plan"); *see Barazza*, 576 F.3d at 805; *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1312-13 (8th Cir. 1993).

*** *

Because the above-cited words of Cafesjian are either non-hearsay or are statements of his then-existing state of mind, the Court should permit the government to admit them into evidence.

## II.     Although The Government Can And Will Offer Evidence Of The Defendant's Admissions, The Court Should Not Permit The Defendant, Via The Rule Of Completeness, To Admit His Own Self-Serving Hearsay.

As noted above, the defendant made a number of inculpatory admissions both to investigators as well as in sworn testimony.   The government intends to offer those statements as admissions of a party-opponent under Rule 801.   The government has disclosed summaries of his statements to investigators, as well as copies of transcripts of his testimony.   The government has excerpted numerous portions of that testimony as exhibits to be read for the jury at trial.   The government has supplied and is supplying the defendant's counsel with those excerpts in advance of trial, and has invited the defense to advise of any additional part of those statements that they believe should be played at the same time under the rule of completeness.   *See* FED. R. EVID. 106.

18

Although the government will not oppose reasonable requests by the defendant to offer small additional portions under the rule of completeness to avoid misunderstandings, the government will oppose any attempt by the defendant to offer large additional self-serving portions of his prior testimony during the government's case.  The Eighth Circuit has explained that Rule 106 "operates to ensure fairness when a misunderstanding or distortion created by the other party can only be averted by the introduction of the full text of the out-of-court statement."   *United States v. Ramos-Caraballo*, 375 F.3d 797, 803 (8th Cir. 2004) (citation omitted).   However, Rule 106 "does not empower a court to admit unrelated hearsay in the interest of fairness and completeness when that hearsay does not come within a defined hearsay exception."   *Id.* (quoting *United States v. Woolbright*, 831 F.2d 1390, 1395) (8th Cir. 1987)).

The Eighth Circuit has also made clear that Rule 106 does not justify the wholesale admission of unrelated hearsay.   *See Ramos-Caraballo*, 375 F.3d at 803.   It is well-established that, although a defendant's own out-of-court statements may be admitted against him as an admission by a party-opponent, *see* FED. R. EVID. 801(d)(2)(A), a defendant may not offer, on his own behalf, his out-of-court statements that are merely consistent with his plea of not guilty.   *See United States v. Waters*, 194 F.3d 926, 930-31 (8th Cir. 1999) (district court properly refused to admit defendant's prior exculpatory statements made during polygraph examination).

**III.    The Government Will Ask The Court To Allow The Case Agents, The IRS Revenue Agent, And The Victim Representative, Kathie Baradaran, To Be Present In Court Even Though They May Be Called As Witnesses.**

The government anticipates and will not oppose the standard defense motion for sequestration of witnesses.   However, the government will ask the Court to except from its sequestration order the two primary case agents, FBI Special Agent Travis Yarbrough and IRS Special Agent Jeremy Martin, as well as IRS Revenue Agent Nona Bosshart.   These exceptions are permissible under Rule 615 and supporting case law.  *See, e.g.*, *United States v. Conners*, 894 F.2d 987, 991 (8th Cir. 1990), *United States v. Scharf*, 558 F.2d 498, 501-02 (8th Cir. 1977), and *United States v. Mohney*, 949 F.2d 1397, 1404-05 (6th Cir. 1991).

In addition, the government requests that the Court permit Kathie Baradaran, who is Cafesjian's daughter, to be excepted from the sequestration order.   Baradaran, a non-practicing attorney who once was a prosecutor in the Ramsey County Attorney's Office, is the executor of the Cafesjians' estate and also has become, upon Cafesjian's death, the President of GLC Enterprises, Inc. and The Cafesjian Family Foundation, Inc. These two entities, for which the defendant once worked, are named parties in the pending civil suit of *Waters v. Cafesjian, et al.*  As such, in addition to some of the admissible statements her father made to her, Baradaran is competent to testify as to the status and posture of the civil case that the defendant initiated against her father and the companies she now leads.

Baradaran has requested that she be permitted to attend the whole trial even though the government may call her as a witness.   The Court should permit this.   The Crime

Victims' Rights Act ("CVRA") defines "victim" to include, in the case of a crime victim who is deceased, "the representative of the crime victim's estate [and] family members. . . ."  18 U.S.C. § 3771(e).  Such victims "may assume the crime victim's rights" under the CVRA, and those rights include "[t]he right not to be excluded from any [] public court proceeding [involving the crime], unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding."  18 U.S.C. § 3771(a)(3).  No such evidence exists here, and the Court should permit Baradaran to attend the trial of the defendant.

## IV. The Court Should Permit The Government To Offer Evidence Regarding A Stamped Signature Card That Waters Produced In The Civil Case Without Calling A Forensic Document Expert Witness.

In the civil case, the defendant produced in discovery certain records purporting to relate to the two US Bank accounts, *6934 and *7856.  Among those records was document that appeared to be a signature card for the US Bank account *7856, opened in July 2004.  The defendant asserted in the civil case that Cafesjian knew about the *7856 account and participated in opening the account.  However, the government will present evidence at trial that the signature card that the defendant produced was not signed by hand, but rather was stamped with a signature stamp that the defendant had access to during his employment.

The government expects to present lay opinion testimony regarding the stamped signature card via one or more of its witnesses.  This is permissible under the rules of evidence and case law.  Rule 701 provides that lay witnesses may testify to "opinions or

inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge. . . ."  FED. R. EVID. 701.   In *United States v. Garth*, 540 F.3d 766, 778-79 (8th Cir. 2008), *abrogated on other grounds by United States v. Villareal-Amarillas*, 562 F.3d 892, 895 (8th Cir. 2009), the Eighth Circuit found it proper for a special agent to be permitted to answer questions regarding the similarity among signatures on multiple documents that were at issue in the case.   The court noted that the agent's analysis was " rational, helpful, and not based on expert knowledge."   *Id.* at 779.

Respectfully submitted,

Date:  February 14, 2014

JOHN R. MARTI
Acting United States Attorney

*s/William J. Otteson*

BY:   WILLIAM J. OTTESON and
SARAH E. HUDLESTON
Assistant U.S. Attorneys